UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 12-11341-RWZ

LISA DELANEY

v.

MASSACHUSETTS BAY TRANSIT AUTHORITY, *et al.*

MEMORANDUM OF DECISION

June 5, 2013

ZOBEL, D.J.

Plaintiff Lisa Delaney previously served as a police officer with the K-9 Unit of the Massachusetts Bay Transit Authority ("MBTA") Transit Police. She now sues the MBTA and two of her former superior officers, Joseph O'Connor and Robert Lenehan, claiming that she was forced out of her employment with the K-9 Unit because she reported wrongdoing by MBTA police sergeant Miguel Sosa.[1] Defendants move to dismiss for failure to state a claim.

## I. Background[2]

Delaney was hired as an MBTA police officer in 1997, and began work with the K-9 Unit in 1999. Ten years later, in 2009, Sosa became the supervisor of the K-9 Unit. After Sosa became Delaney's supervisor, he began behaving towards her in a manner

[1] Sosa was formerly a defendant in this action; he has now been dismissed by stipulation. See Docket # 26.

[2] As appropriate on a motion to dismiss, the facts here are given as alleged in the complaint. See Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 4 (1st Cir. 2011).

she considered sexually and emotionally harassing. She filed a complaint about his conduct with the MBTA Human Resources Office in 2011.

At that time, O'Connor was serving as the MBTA deputy chief overseeing the entire K-9 unit. On November 14, 2011, Delaney contacted O'Connor and asked that she no longer be required to train with Sosa until her harassment complaint had been resolved. In addition, she informed O'Connor that Sosa had instructed her to falsify her training records. Specifically, she stated that when Sosa was running the Narcotic Detection School from April to June of 2010—about eighteen months previously—he had cancelled three class days, but had instructed Delaney to fill out her training sheets as if the classes had occurred.

Delaney's allegations about the falsified training sheets launched a separate internal investigation. As part of that investigation, Delaney was ordered to meet with two MBTA internal affairs investigators. She provided them with proof of her allegations about the falsified training sheets, as well as information indicating that the K-9 officers attending the Narcotic Detection School under Sosa received two weeks of pay for training they did not attend.

Shortly thereafter, on December 7, 2011, Delaney received notice that the 7:30am-3:30pm shift on which she had worked for the previous twelve years was being eliminated. All K-9 patrol officers assigned to that shift were switched to a 10:00am-6:00pm shift. Delaney alleges that this shift change was made in retaliation for her disclosure of Sosa's wrongdoing. She states that Lenehan, who was her special operations section commander, and O'Connor were both aware that she could not work

past 5:00pm due to her childcare responsibilities. That is, O'Connor and Lenehan both knew the shift change would force Delaney to leave the K-9 Unit.

K-9 officers serve eight-hour shifts, with one hour at the beginning or end of the shift allotted for care and maintenance of the dogs. On hearing of the new schedule, Delaney asked O'Connor by email whether her hour for dog care could come at the end of her shift (i.e. from 5:00pm-6:00pm). That accommodation would apparently alleviate her childcare issues. O'Connor responded that Delaney had to take her hour for dog care at the beginning of her shift (from 10:00am-11:00am), because crime levels required K-9 officers to be on patrol until 6pm.

Delaney began working the new schedule on January 7, 2012, using "time owed" to leave early at the end of her shift and pick up her child from daycare. She advised O'Connor and Lenehan that once her "time owed" ran out, she would have to resign from the K-9 Unit.

A few weeks later, Delaney learned that two junior K-9 patrol officers were being allowed to take their hour for dog care at the end of their shift (from 5:00pm-6:00pm). She again contacted Lenehan to ask whether she could do the same. Lenehan first inquired how Delaney had learned of her fellow officers' schedules; he then placed a call to the area supervisor over those officers, instructing him to order his officers to take their hour of dog care at the beginning of their shifts.

Over the next month and a half, Delaney twice more asked Lenehan for permission to take her hour for dog care at the beginning of her shift. Each time, Lenehan told her the change might be possible, but he could not definitively approve it.

Because she could not get a definitive approval for her shift change, Delaney resigned from the K-9 Unit when her "time owed" ran out on March 9, 2012.

As further evidence of retaliation, Delaney points to a mandatory K-9 training in January 2012 that was scheduled by Sosa for a Tuesday when he knew Delaney was not available. Delaney complained to the MBTA's Office of Diversity and Civil Rights, after which the training was rescheduled. She also notes that she was not allowed to purchase her dog from the K-9 Unit upon her resignation, contrary to normal MBTA practice.

## II. Legal Standard

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The court accepts as true all factual allegations contained in the complaint, but not legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). If the complaint fails to state a plausible claim upon which relief can be granted, it must be dismissed. Id.

## III. Analysis

Delaney's complaint asserts four different counts. Defendants move to dismiss each one.

### A. Count 1

In Count 1, Delaney claims that the MBTA retaliated against her for providing information about a violation of law: namely, Sosa's falsified training records. She asserts that this retaliation violated the Massachusetts state whistleblower statute, Mass. Gen. Laws ch. 149, § 185. As pleaded, her claim apparently rests on two

subsections of that statute. The first forbids retaliation by a state employer against an employee who "[d]iscloses, or threatens to disclose . . . an activity, policy or practice of the employer . . . that the employee reasonably believes is in violation of a law." Id. § 185(b)(1). The second forbids retaliation against an employee who "[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes is in violation of a law." Id. § 185(b)(3).

The MBTA argues that Delaney's claim cannot survive under either subsection because Delaney cannot show she reasonably believed Sosa violated any law by falsifying the training records. The MBTA correctly notes that the state whistleblower act only forbids retaliation for reporting violations of law, not for reporting violations of workplace rules or procedures. Shea v. Emmanuel Coll., 682 N.E.2d 1348, 1350 (Mass. 1997). But taking the facts alleged in the light most favorable to Delaney, she could reasonably have believed that Sosa was violating the law by falsifying police training records—particularly since those falsified records apparently caused other officers to be paid for work they did not perform. See Mailloux v. Town of Littleton, 473 F. Supp. 2d 177, 185 n.25 (D. Mass. 2007) ("Plaintiff can reasonably believe that illegal activity occurred even if no law is broken."); cf. Mass. Gen. Laws ch. 12, §§ 5A-5O (state false claims act). The MBTA's argument therefore fails.

Next, the MBTA argues that Delaney's claim under § 185(b)(1) fails because she has not alleged that she provided written notice of the illegal practice to the MBTA before filing this lawsuit. See Mass. Gen. Laws § 185(c)(1); Dirrane v. Brookline Police Dep't, 315 F.3d 65, 73 (1st Cir. 2002). But the written notice requirement is an

affirmative defense, not an element of Delaney's claim. Bennett v. City of Holyoke, 362 F.3d 1, 8 (1st Cir. 2004). As such, Delaney is not required to plead written notice in her complaint. If Delaney conceded the absence of written notice, then dismissal on that ground would be appropriate. See Dirrane, 315 F.3d at 73. But because she contests the point, this issue must wait for further factual development. See Bolduc v. Town of Webster, 629 F. Supp. 2d 132, 153-54 (D. Mass. 2009) (resolving written notice issue on summary judgment); Bennett v. City of Holyoke, 230 F. Supp. 2d 207, 219-220 (D. Mass. 2002) (same), aff'd, 315 F.3d 65 (1st Cir. 2004). But cf. Perry v. Agnew, 857 N.E.2d 508, 2006 WL 3422214 (Mass. App. Ct. 2006) (unpublished) (affirming dismissal where the plaintiffs' complaint did not allege written notice and the record showed a clear lack of such notice).

Finally, the MBTA argues that Delaney's claim under § 185(b)(3) fails because Delaney has not alleged that she objected to or refused to participate in any activity, policy or practice that she considered unlawful. That point is well taken. According to the allegations in the complaint, Delaney apparently complied with Sosa's direction to submit falsified training sheets. There is no allegation showing that she objected to that practice or refused to participate in it; the only pertinent allegation is that she disclosed Sosa's behavior to the MBTA some eighteen months later. Her allegations thus state a claim under § 185(b)(1), but not under § 185(b)(3).

**B. Count 2**

In Count 2, Delaney claims that O'Connor and Lenehan interfered with her civil rights by threats, intimidation and coercion in violation of the Massachusetts Civil

Rights Act. See Mass. Gen. Laws. ch. 12, §§ 11H-11I. But the complaint does not allege any facts showing threats, intimidation, or coercion. Count 2 is therefore dismissed.

**C. Count 3**

Count 3, brought under 42 U.S.C. § 1983, claims that O'Connor and Lenehan violated Delaney's constitutional rights by retaliating against her for reporting Sosa's misconduct. O'Connor and Lenehan move to dismiss this count on the ground that in making her report, Delaney was speaking as a government official rather than as a private citizen.

In Garcetti v. Ceballos, 547 U.S. 410 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 421. It has proven exceptionally difficult to determine when an employee is speaking pursuant to her official duties. "Navigating the shoals of the standard articulated by the Supreme Court in Garcetti v. Ceballos has proven to be tricky business, and particularly so in the context of a motion to dismiss, because the inquiry is so highly fact intensive and context specific." Decotiis v. Whittemore, 635 F.3d 22, 26 (1st Cir. 2011); see also id. at 30-35 (discussing and applying the test). In applying the Garcetti standard, a court must consider the entire context of the speech, including such factors as (1) whether the employee was commissioned or paid to make the speech, (2) the subject matter of the speech, (3) whether the speech was made up the chain of command, (4) whether

the employee spoke at her place of employment, (5) whether objective observers would believe the employee represented the employer in her speech, (6) whether the employee's speech derived from special knowledge obtained from her employment, and (7) whether there is a citizen analogue to the speech. Id. at 32.

Here, several factors point toward finding that Delaney was speaking as a government employee. She was speaking up the chain of command to a superior officer; she was speaking about information related to her employment; and she had obtained that information only through her employment. On the other hand, Delaney apparently was not specifically instructed to make her initial disclosure about Sosa's misconduct, nor did that disclosure form a normal part of her employment responsibilities. Moreover, many of the facts about Delaney's speech remain undeveloped, such as where the speech took place, whether Delaney was in uniform, whether the speech was formal or informal, whether Delaney and Lenehan considered the speech part of a normal employment interaction, and so on. Given these factual ambiguities, it would be premature to dismiss Delaney's First Amendment claim at this stage. See id. at 35 n.15 ("[T]he fact-intensive nature of the Garcetti analysis does not easily lend itself to dismissal on a Rule 12(b)(6) motion.").

**D. Count 4**

Count 4 charges the MBTA, O'Connor, and Lenehan with civil conspiracy, alleging that they conspired to force Delaney to resign from the K-9 Unit in retaliation for her disclosure of Sosa's wrongdoing. There are two kinds of civil conspiracy. The first is true conspiracy, which requires a showing of coercion. See Kurker v. Hill, 689

N.E.2d 833, 836 (Mass. App. Ct. 1998). The second is a type of joint liability for concerted action, "whereby liability is imposed on one individual for the tort of another." Id.; see Taylor v. Am. Chem. Council, 576 F.3d 16, 34-35 (1st Cir. 2009). If Count 4 is intended to plead this second type of civil conspiracy, it does not assert an independent cause of action; it simply states that each defendant is liable for torts committed by the others.

In either case, Delaney's conspiracy claim fails. As to true conspiracy, as discussed above, Delaney has not alleged facts showing coercion. As to joint liability for conspiracy, that doctrine requires showing a common plan to commit a tortious act. Kurker, 689 N.E.2d at 833. Although Delaney has conclusorily alleged that defendants acted in furtherance of a common plan, her factual allegations do not plausibly support that conclusion. The mere fact that O'Connor and Lenehan each allegedly retaliated against Delaney does not show that they conspired to retaliate against her. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57 (2007) (allegations of parallel conduct alone are not sufficient to show conspiracy).[3]

Furthermore, Delaney's conspiracy claim against the MBTA is precluded for two reasons. First, a corporate entity cannot conspire with its own officers and agents. See Rhodes v. Consumers' Buyline, Inc., 868 F. Supp. 368, 377 (D. Mass. 1993); see also Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 131 (1st Cir. 2006). Second, the

[3] Defendants incorrectly assert that a conspiracy claim must be pleaded with particularity. That is patently untrue; the Supreme Court has squarely and unanimously held that the only claims subject to a heightened pleading standard are those covered by Federal Rule of Civil Procedure 9(b), involving fraud or mistake. See Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993). However, Delaney's complaint fails the normal Rule 8(a) pleading standard. See Twombly, 550 U.S. at 555-57.

state whistleblower claim in Count 1 preempts any other claim against the MBTA based on the same conduct (i.e., the allegedly retaliatory discharge). Mass. Gen. Laws ch. 149, § 185(f); see Bennett, 230 F. Supp. 2d at 220-21.

## IV. Conclusion

Defendants' motion to dismiss (Docket # 13) is ALLOWED IN PART and DENIED IN PART. Counts 2 and 4 of the complaint are DISMISSED, as is Count 1 to the extent that it rests on Mass. Gen. Laws ch. 149, § 185(b)(3). The case may proceed on Count 1 against the MBTA, under Mass. Gen. Laws ch. 149, § 185(b)(1), and on Count 3 against O'Connor and Lenehan.

June 5, 2013
DATE

/s/Rya W. Zobel
RYA W. ZOBEL
UNITED STATES DISTRICT JUDGE